## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **10-00759-hb**
Adversary Proceeding Number:  **10-80039-hb**

## ORDER

The relief set forth on the following pages, for a total of 24 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**04/20/2011**



US Bankruptcy Judge
District of South Carolina

Entered: 04/20/2011

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>David Robert Marcotte,<br><br>                      Debtor(s). | C/A No. 10-00759-HB<br><br>Adv. Pro. No. 10-80039-HB<br><br>Chapter 7<br><br>**ORDER** |
| David Robert Marcotte,<br><br>                      Plaintiff(s),<br><br>v.<br><br>Brazos Higher Education Service Corporation<br>Texas Guaranteed Student Loan Corporation,<br><br>                  Defendant(s). | |

**THIS MATTER** came before this Court for trial on March 23, 2011. In this adversary proceeding, David Robert Marcotte ("Marcotte") is seeking discharge of a student loan pursuant to 11 U.S.C. § 523(a)(8).[1] Texas Guaranteed Student Loan Corporation ("TGSLC") contests the dischargeability of this debt.

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the pleadings and record, the evidence presented, and the arguments made by counsel at trial, and pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by

---

[1] Further reference to the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*, will be by section number only.

Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law.[2]

## FINDINGS OF FACT

Marcotte was in an automobile accident in 1996. He broke several teeth and suffered severe and permanent injuries to his spinal cord. Despite his injuries, Marcotte was able to attend and graduate from college in 2002 with a bachelor's degree in accounting. Marcotte obtained student loans from Brazos Higher Education Service Corporation to assist with his college tuition and expenses.[3] Marcotte consolidated his student loans[4] ("Loan") to a single monthly payment under the William D. Ford Federal Direct Loan Program on July 15, 2004. *See* Def.'s Ex. A, at 3. TGSLC did not assert that Marcotte has failed to take advantage of any other opportunities to consolidate his student loans or repay them on more manageable terms.

After graduating from college, Marcotte worked for six (6) years, earning an annual salary of approximately $48,000.00. Marcotte testified that during this time, the pain from injuries he sustained in the accident gradually worsened. He currently has little use of his right upper extremity and suffers from constant pain. Despite his injuries, he is able to walk and do various exercises; however, the injuries have rendered him unable to work. TGSLC did not challenge this testimony in any way.

Marcotte made payments on the Loan the entire six years he was employed, and continued to make Loan payments after he stopped working. The monthly Loan payments

---

[2] To the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and *vice versa*.

[3] Marcotte testified that he is unsure as to how many student loans he took out to pay for the three years he attended college.

[4] Although the number of loans taken out by Marcotte is unknown, it appears that at one point in time he had two (2) outstanding student loans from Brazos Higher Education Service Corporation. Marcotte consolidated these loans under a single note and, for all purposes herein, the loans are treated as a single loan and debt owed to TGSLC. *See* Def.'s Ex. A.

were approximately $100.00 and the parties stipulate that the remaining balance on the Loan is $8,755.58.[5]  The 2004 Note attached to Defendant's Answer indicates that the original interest rate on the Loan was 3.37%. (Def.'s Answer, Doc. No. 16 at 5).[6]

Marcotte filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on February 4, 2010 ("Bankruptcy Case").  The Bankruptcy Case was assigned case number 10-00759-hb.   Marcotte scheduled outstanding unsecured debts of $42,762. (Schedules, Doc. No. 1 at 1-18).  Included in that amount is a debt to Brazos Higher Education Service Corporation for educational loans.  The parties stipulate that TGSLC is the current owner and holder of the Loan.

Marcotte is single, has no dependents and there was no evidence presented regarding his age.  Marcotte disclosed income for 2008 and 2009 at approximately $10,000.00 per year with the source listed as "Disability State of Michigan Civil Service commission." (Statement of Financial Affairs, Doc. No. 1 at 24).   Marcotte's Amended Schedule I indicates he was receiving temporary Social Security benefits of $1,142.00 per month at the time the case was filed in February 2010.[7] (Amended Schedules, Doc. No. 10 at 1-2).  After the period of temporary benefits but prior to trial of this matter, Marcotte qualified for Social Security Disability Income ("SSDI").  Marcotte's counsel argued at trial that, since January 2011, Marcotte has received an *increased* amount of $1,049.00 SSDI per month.  However, after a review of the transcript the Court believes that this statement was in error because

---

[5] In 2004, the balance of the note was $12,876.00. *See* Def.'s Answer, Doc. 16 at 2.
[6] A payment of $100.00 per month toward a debt of $8,756.00 at the interest rate of 3.37% requires a repayment period of more than eight (8) years.
[7] This Amendment was supported by a copy of the letter from the Social Security Administration verifying the amount.

3

this amount is less than Marcotte's temporary disability.[8]  Marcotte testified that he will continue to receive SSDI for three (3) years, upon approval from the Social Security Administration to continue his SSDI.  This is Marcotte's only source of income.

Marcotte's Schedule J, filed in February 2010, indicated that he budgeted $1,060.00 per month for medical and dental expenses alone, $250.00 for food, $50.00 for transportation, $230.00 for auto insurance, $10.00 for clothing and $100.00 for the Loan, for total expenses of $1,700.00. (Schedules, Doc. No. 1 at 22).  His budget did not include any expenses for housing, utilities, a telephone, etc.  Assuming the highest income figure in the record—$1,142.00 per month—Marcotte would have a monthly budget deficit of $558.00 based on his February 2010 schedule of expenses.  This deficit arises before adding any expenses for housing or utilities.

Marcotte lives with his parents in their home in Roebuck, South Carolina. Marcotte's parents do not charge him for rent or utilities at this time and assist him with his food expense.  According to Marcotte's testimony, his parents are retired and their sole source of income is Social Security.  There is little indication in the record regarding how long Marcotte's parents plan to or have the ability to continue to supplement his food expense and provide him with free housing.

After he filed for bankruptcy, Marcotte purchased a 1998 Jeep Wrangler for $6,800.00.  Marcotte was able to purchase the car with $3,800.00 he personally accumulated and $3,000.00 he borrowed from his sister.  As a result of this purchase, Marcotte pays approximately $108.00 per month for auto insurance.  He, therefore, has reduced the

---

[8] It appears that counsel may have meant $1,149.00 per month instead of $1,049.00.  However, the Court is convinced that the increase was minimal and the uncertainty at this income level has no significant impact on the Court's decision.

$230.00 monthly expense listed on his Schedule J by $122.00.[9]  This is Marcotte's only car and his parents own one car as well.

Marcotte sees several doctors for injuries related to the car accident.  One doctor is located in Columbia, South Carolina, approximately one and one-half hours away from his parents' home.  The other doctors and the pharmacy where Marcotte fills his prescriptions are located approximately twenty minutes from his residence.  He also seeks regular treatment at a pain clinic.  Marcotte testified that, according to his doctor, the only way to assuage his pain is to continue taking the medications currently prescribed.

Marcotte initially had implants to replace his broken teeth after the 1996 accident; however, he testified that the implants only have a lifespan of ten years.  Therefore, he needs to replace them, which will also require two root canals.  Marcotte testified that the root canals will cost approximately $1,000.00 each and he is not sure of the cost of the implants. It is not clear whether these costs were considered when Marcotte calculated the estimated $1,060.00 per month in anticipated medical and dental expenses on his Schedule J.

At the time of Marcotte's car accident in 1996, he held a car insurance policy with Allstate.  According to Marcotte's testimony, pursuant a provision of his insurance policy, Allstate is supposed to reimburse him for some monthly medical and dental expenses resulting from the accident.  Marcotte, however, stated that reimbursements from Allstate have been difficult to obtain because he must submit a reimbursement request each month, attaching all receipts and written proof from his doctor(s) that the expenses are related to injuries from the car accident.  He testified that, in his experience, full reimbursement is not

---

[9] Marcotte's schedules and the case docket indicate that he surrendered a 2006 Hyundai Tucson Limited Crossover valued at $10,625.00 and encumbered by a lien, and that at filing he paid $230.00 per month for auto insurance instead of the $108.00 that he currently pays. *See* Schedules, C/A No. 10-00759-hb, Doc. No. 1 at 22, 31; *see also* Order Modifying the Automatic Stay, Doc. No. 12 at 2 (granting Hyundai Motor Finance Co. relief from the automatic stay on Marcotte's Hyundai Tucson).

reliable or guaranteed.  Marcotte has only been able to request reimbursements twice from Allstate.  As a result of submitting one of these requests, last year he received $1,000.00 toward the medication costs for one month.  Marcotte testified that he would be required to pay for the medical and dental procedures prior to requesting any reimbursement.

Marcotte testified that since January 2011 he has been enrolled in Medicare at a cost of approximately $107.00 each month.  From Marcotte's testimony, it was difficult to determine the exact amount of his current and anticipated monthly medical expenses and the anticipated or historical reimbursement of those expenses by Medicare or insurance.  His testimony indicated that he has significant ongoing prescription expenses that have ranged from $300.00 to $600.00 in some months, with other medical expenses of over $800.00 in a recent month.  In addition, he is facing major dental expenses, as indicated above.  Many may be supplemented by Medicare, but the remainder must be paid from his income and/or remaining assets.

Marcotte has a 401K account with a balance of approximately $11,200.00. *Id.* at 13. A review of his schedules indicates no other significant assets.[10]  Marcotte testified that he would like to use a portion of the 401K balance to repay the post-petition loan from his sister for the car and to pay for his dental procedures.  No evidence was presented as to whether Marcotte would be penalized for withdrawing from his 401K account.

The Court observes that Marcotte was a credible witness and that he responded to questions sincerely, even if the response could be interpreted as contrary to his cause.

## DISCUSSION AND CONCLUSIONS OF LAW

---

[10] The value of Marcotte's listed assets is $5,125.00, excluding the 401K balance and the Hyundai Tucson automobile he surrendered to the secured lender. *See id.* at 9-12.

A discharge in chapter 7 relieves debtors from all pre-petition debts, with the exception of certain debts enumerated in § 523. Government-backed educational loans are among those debts excepted.[11]

> A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt—
>> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>>> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>>> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend . . .

11 U.S.C. § 523(a)(8) (West 2010). Thus, an educational debt is generally not dischargeable in bankruptcy unless the debtor establishes that he would suffer an undue hardship if required to repay it. *Spence v. Educ. Credit Mgmt. Corp. (In re Spence)*, 541 F.3d 538, 543 (4th Cir. 2008).

Marcotte asserts that he is entitled to discharge the Loan pursuant to § 523(a)(8). "Debtors seeking to discharge their student loans bear the burden of proving that they are 'in the *limited class* of debtors for which § 523(a)(8) meant to allow discharge.'" *Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 324 (4th Cir. 2008) (emphasis in original) (quoting *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 400 (4th Cir. 2005)). "Debtors receive valuable benefits from congressionally authorized loans, but Congress in turn requires loan recipients to repay them in all but the most dire circumstances." *Frushour*, 433 F.3d at 399 (citing *Pa. Higher Mgmt. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995)).

---

[11] Neither party asserted that this loan was not a government-backed loan subject to § 523(a)(8).

Although "undue hardship" is not defined in the Code by Congress, the Fourth Circuit has adopted the *Brunner* test to determine whether the debtor suffers an undue hardship if required to repay a student loan. *See Frushour*, 433 F.3d at 400 (adopting the *Brunner* test for chapter 7 cases); *see also Ekenasi v. Educ. Res. Inst. (In re Ekenasi)*, 325 F.3d 541, 547 (4th Cir. 2003) (adopting the *Brunner* test for chapter 13 cases); *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 906 (D.S.C. 1995) (adopting the *Brunner* test for the District of South Carolina).

In order to prove an undue hardship within the meaning of § 523(a)(8), the *Brunner* test requires the debtor to show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and; (3) that the debtor has made good faith efforts to repay the loans.

*Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner)*, 831 F.2d 395, 396 (2d Cir. 1987). "The debtor seeking a discharge bears the burden of proving that [he] meets all three factors of the undue hardship test by a preponderance of the evidence." *Spence*, 541 F.3d. at 543-44 (citing *Mosko*, 515 F.3d at 324; *Frushour*, 433 F.3d at 400); *see also Straub v. Educ. Credit Mgmt. Corp. (In re Straub)*, 435 B.R. 312, 315 (Bankr. D.S.C. 2010) ("The *Brunner* three part test is stated in the conjunctive.  Thus, if any *one* of the requirements is not met, the bankruptcy court's inquiry must end and no part of the loan can be discharged." (emphasis in original) (citations omitted)).

The heightened "undue hardship" standard "protects the integrity of the student-loan program and saves it 'from fiscal doom.'  It also ensures public support for the program by preventing debtors from easily discharging their debts at the expense of the taxpayers who

8

made possible their educations." *Frushour*, 433 F.3d at 400 (citations omitted).  Therefore, the requirements under the *Brunner* test are to be strictly construed and equitable concerns or other extraneous factors not included within its framework may not be considered by the Court in its dischargeability analysis. *Straub*, 435 B.R. at 317 (citing *Faish*, 72 F.3d at 306).

TGSLC only asserts that Marcotte did not make good faith efforts to repay the Loan.[12]  However, the Court deems it appropriate to analyze each prong of the *Brunner* test as applied to Marcotte's situation because the analysis of certain prongs overlaps with determinations made under other portions of the test. *See Richardson v. N.C. Educ. Assistance Auth. (In re Richardson)*, Adv. No. S-07-00096-5-AP, 2008 WL 3911075, at *4 (Bankr. E.D.N.C. Aug. 14, 2008) (stating that analysis of debtor's efforts to obtain employment, maximize income, and minimize expenses under the third prong "frequently overlaps with analysis of the second prong, under which the court must determine whether the debtor's state of affairs is likely to persist" (citing *In re Gerhardt*, 348 F.3d 89, 93 n.3 (5th Cir. 2003))).

<u>First Prong of *Brunner*</u>

Analysis under the first *Brunner* prong requires the Court to examine Marcotte's budget to determine whether he is able to maintain a minimum standard of living going forward. *See Mosko*, 515 F.3d at 326 n.7.  This part of the test "requires a debtor to show more than an austere budget or tight finances." *Straub*, 435 B.R. at 316 (citations omitted); *see also White v. Educ. Credit Mgmt. Corp. (In re White)*, Adv. No. 07-4157, 2008 WL 5272508, at *5 (Bankr. E.D. Tex. Dec. 17, 2008) ("While a precise definition has yet to be

---

[12] Counsel for TGSLC did not contend that Marcotte did not meet the first or second *Brunner* prongs: (1) that he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself if forced to repay the loans; and (2) that additional circumstances exist indicating that his state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

provided, '[c]ourts universally require more than temporary financial adversity and typically stop short of utter hopelessness.'" (citations omitted)); *Cehula v. Sallie Mae Servicing (In re Cehula)*, 327 B.R. 241, 245 (Bankr. W.D. Pa. 2005) ("A showing that debtor's finances will be 'tight,' without something more, will not suffice." (citing *Faish*, 72 F.3d at 306)). Although a debtor is expected to live within the constraints of a frugal budget, he is not expected to live in abject poverty before his student loan may be discharged. *White*, 2008 WL 5272508, at *5 (citations omitted). "[T]he central factors in determining whether a debtor will indeed sustain a minimal standard of living if forced to repay his loan are the debtor's current income and expense levels." *Ammirati*, 187 B.R. at 907.

Marcotte's current and anticipated monthly income consists solely of SSDI, and his income is quite low.[13] By moving in with his parents, he has made commendable efforts to minimize his expenses. Marcotte's Schedule J, filed in February 2010, lists frugal, non-medical expenses of $540.00, excluding the Loan payment. According to his testimony, this amount must be adjusted up by the costs of Medicare (+$107.00) and down as a result of a reduction in auto insurance ($230.00 – $108.00 = -$122.00), leaving expenses of $525.00. His fixed income is approximately $1,142.00 per month. Therefore, after payment of these minimal expenses, $617.00 of his income remains to apply towards medical and dental costs and any other unscheduled expenses that may arise. Marcotte estimated his medical and dental expenses at $1,060.00 in February of 2010, which would leave a budget deficit of $443.00 ($617.00 – $1,060.00). However, his testimony further indicated that these amounts for medical and dental expenses may be reduced by Medicare and any Allstate

---

[13] See U.S. Dep't of Health & Human Serv., *The HHS Poverty Guidelines for the Remainder of 2010 (August 2010)*, Office of the Assistant Secretary for Planning and Evaluation, http://aspe.hhs.gov/poverty/10poverty.shtml (last revised Jan. 21, 2011) (stating that the poverty guidelines for one person within the 48 contiguous states is $10,830.00 per year).

reimbursements.    Determining the exact amount of any reimbursements is difficult; however, it is clear that if Marcotte was required to pay $617.00 or more of these estimated costs per month without reimbursement, his income would be exhausted.[14]

Further, Marcotte's ability to pay **any** amount towards his medical and dental expenses is completely dependent upon the charity of his parents.  Marcotte is only able to meet his basic needs because they provide free housing and supplement his food costs.[15] *See White*, 2008 WL 5272508, at *5 (finding that debtor satisfied the first *Brunner* prong because her "current monthly income consist[e]d entirely of contributions from her mother to pay her minimal living expenses").  Marcotte is, therefore, unable to maintain a minimal standard of living from his income. *See Peña v. United Student Aid Funds, Inc. (In re Peña)*, 155 F.3d 1108, 1113 (9th Cir. 1998) (stating that debtors' monthly deficit of $41.00, not including student loan payments, clearly established that they could not maintain a minimal standard of living and pay off their student loans).

---

[14] In a case involving a debtor with similar financial affairs, the Bankruptcy Court for the Eastern District of North Carolina found the debtor to have satisfied the first *Brunner* prong because:

> [He] is currently unemployed, and he has been only periodically employed in temporary jobs since he obtained his certificate from [which he took out student loans for] . . . He receives $162 per month in food stamps, and he has no assets except a fully-encumbered vehicle. [Debtor] lived with his parents until recently, did not pay rent and did not contribute to the costs of utilities.  He was unable to pay the filing fee in this case, and was unable to hire an attorney to represent him in the case and in this adversary proceeding.
>
> [Debtor]'s only scheduled monthly expenses include a car payment of $400, which has been reduced to $333 pursuant to a reaffirmation agreement; $200 for food; $50 for clothing; $275 for transportation, car taxes and car insurance; $20 for recreation; $50 for charitable contributions; and $50 for payments for his daughter . . . Though his expenses are minimal, he has difficulty meeting those needs due to his lack of income, and he is, in fact, behind on his car payments. Because of [Debtor]'s lack of income and assets, he has shown an inability to meet a minimal standard of living if he is forced to repay the loans.

*Richardson v. N.C. Educ. Assistance Auth. (In re Richardson)*, Adv. No. S-07-00096-5-AP, 2008 WL 3911075, at *2 (Bankr. E.D.N.C. Aug. 14, 2008)  (internal citations omitted).

[15] Marcotte budgeted $250.00 per month for food, approximately $8.30 per day.

However, while addressing the **third** prong of the *Brunner* test, TGSLC argued that Marcotte could use some or all of his 401K account to repay the Loan without undue hardship.[16]  This argument is relevant to the first prong because:

> a debtor, even though having very little income, may still be found to have the ability to repay their student loan when it is shown that the debtor has, or will likely have, access to *significant assets* which could be utilized to repay the loan . . .
>
> To hold otherwise, and allow a debtor with significant assets to escape their student-loan obligations, would undercut the inherent nature of an "undue hardship" inquiry: Ensuring that debtors with the means to repay their student loans do so.

*Cekic-Torres v. Access Group, Inc. (In re Cekic-Torres)*, 431 B.R. 785, 790-91 (Bankr. N.D. Ohio 2010) (emphasis added) (internal citations omitted).

In *Craig v. Educ. Credit Mgmt. Corp. (In re Craig)*, 579 F.3d 1040 (9th Cir. 2009), the debtor, who made $68.00 monthly contributions to her 401K account, sought to discharge her student loans under § 523(a)(8). *Id.* at 1043.  Although there is no evidence in the instant case that Marcotte is continuing to make contributions to his retirement account, the *Craig* case assists the Court in determining how other courts have viewed retirement accounts when considering an undue hardship discharge.  In deciding whether the 401K contributions were "reasonably necessary" expenses under the first *Brunner* prong, the *Craig* court found that there is no "*per se* rule that voluntary contributions to retirement plans are never a reasonably necessary expense." *Id.* at 1046 (citing *Hebbring v. U.S. Trustee*, 463 F.3d 902 (9th Cir. 2006)); *but see In re Woody*, 494 F.3d 939, 954 (10th Cir. 2007) (agreeing with principle that saving for one's retirement is a worthy goal; however, in the context of bankruptcy proceedings, retirement contributions should not take precedent over repayment of preexisting debts).  The *Craig* court remanded the matter to the

---

[16] There was no evidence presented to indicate how much money Marcotte would net if he withdrew funds from the account at this time.

bankruptcy court to determine whether the contributions were reasonably necessary and instructed that:

> [i]n making this fact-intensive determination, courts should consider a number of factors, including but not limited to: the debtor's age, income, overall budget, expected date of retirement, existing retirement savings, and amount of contributions; the likelihood that stopping contributions will jeopardize the debtor's fresh start by forcing the debtor to make up lost contributions after emerging from bankruptcy; and the needs of the debtor's dependents. *Courts must allow debtors to seek bankruptcy protection while voluntarily saving for retirement if such savings appear reasonably necessary for the maintenance or support of the debtor or the debtor's dependents.*

*Id.* at 1046-47 (emphasis added) (citing *Hebbring*, 463 F.3d at 907).

The *Craig* court's decision is insightful because the Ninth Circuit recognized that even ongoing contributions to and accumulation of retirement savings may be justified under the right facts, and it is a fact-intensive inquiry to determine the role that retirement savings play in an undue hardship dispute.  While *Craig's* view of ongoing retirement contributions may not withstand challenge in this circuit, it does provide some guidance in reviewing this matter.  In the instant case, Marcotte does not wish to continue a controversial funding of a retirement account from his income while attempting to discharge a student loan debt.  Rather, the issue is whether the Court should require a debtor, who has insufficient income to meet his basic needs, to liquidate a minimal amount in a retirement account and apply those funds to an educational loan.  After a factual inquiry based on this debtor's current budget and future prospects, the Court finds that the 401K balance is necessary to pay for current and future necessities.[17]

## Second Prong of *Brunner*

---

[17] There was no evidence regarding the net amount that he could withdraw or borrow.  Assuming Marcotte could receive a net distribution of $11,200 without penalty or tax, this would add approximately $311.00 per month to his budget over thirty-six months; approximately $117.00 per month over the next eight years.  This amount could supplement his food, medical, dental, housing and unexpected expenses but is insufficient to provide a minimal standard of living from his income and assets and pay the Loan.

The second part of the *Brunner* test requires proof that additional circumstances exist indicating that the debtor's state of affairs is likely to persist for a significant period of time. *Frushour*, 433 F.3d at 401; *see also Gerhardt*, 348 F.3d at 92 ("[T]he debtor must specifically prove 'a total incapacity . . . in the future to pay [his] debts for reasons not within [his] control.'" (quoting *Faish*, 72 F.3d at 307)). "'Additional circumstances' encompass circumstances that impact on the debtor's future earning potential but which were either not present when the debtor applied for the loans or have since been exacerbated." *White*, 2008 WL 5272508, at *5 (citing *Gerhardt*, 348 F.3d at 92).

In the Fourth Circuit, "[t]his factor is 'the heart of the *Brunner* test.' It most clearly reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies any bankruptcy." *Frushour*, 433 F.3d at 401 (citing *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1085 (9th Cir. 2001)). The second prong is intended to be demanding and requires a "certainty of hopelessness" that the debtor will be unable to repay the student loans. *Id.* "For example, although not exhaustive, a debtor may be able to meet this test if [he] can show 'illness, disability, a lack of useable job skills, or the existence of a large number of dependents.'" *Id.* (quoting *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir. 2005)).

In *Frushour*, the Fourth Circuit strictly applied the *Brunner* test to reverse the lower courts, thereby denying a debtor's request to discharge a student loan debt as an undue hardship. The Court instructed that the hardship should be "unwarranted" or "excessive" and "not the garden-variety hardship." *Id.* at 399; *see also Educ. Credit Mgmt. Corp. v. Nys (In re Nys)*, 446 F.3d 938, 944 (9th Cir. 2006) ("What separates a 'garden-variety debtor' from a debtor who can show 'undue hardship' is the realistic possibility that a 'garden-

variety debtor' could improve her financial situation in the future."). Discharge for undue

hardship should be allowed only in the "most dire circumstances." *Id.*

The *Frushour* court held that the debtor failed to prove the second factor of the

*Brunner* test because she "provided no additional circumstances beyond the debt itself to

show that her hardship [was] undue." *Id.* at 401. There were no additional circumstances

preventing Frushour from maintaining a minimal standard of living because she was

educated, worked in several different areas of employment, and she and her son were not

mentally or physically disabled. *See id.* Furthermore, despite the fact that Frushour's

financial condition was not desirable, there was no indication that she could not return to a

job similar to one she previously held where she made almost double her current income. *Id.*

Therefore, the court concluded that "[h]aving a low paying job . . . does not in itself provide

undue hardship, especially where the debtor is satisfied with the job, has not actively sought

higher-paying employment, and has earned a larger income in previous jobs." *Id.*

Unlike the debtor in *Frushour*, Marcotte has met his burden of proof under the

second prong. It is uncontroverted that the pain from Marcotte's injuries forced him to leave

his previous job and render him unable to work.[18] His income for the past three years has

been solely from disability payments and his condition is likely to endure through no fault of

his own. Marcotte's injuries and disability result in increased medical expenses that are

unlikely to end. Therefore, the Court finds that Marcotte has established "additional

circumstances" that are likely to persistent for a significant period of time.

---

[18] TGSLC does not contest that Marcotte is disabled. In addition the Court finds Marcotte's testimony persuasive to prove he suffers from a disability that prevents him from being gainfully employed. The Court's finding is supported by the fact that "[a] debtor is not required to present expert testimony to corroborate [his] own testimony about [his] health." *White v. Educ. Credit Mgmt. Corp. (In re White)*, Adv. No. 07-4157, 2008 WL 5272508, at *5 (Bankr. E.D. Tex. Dec. 17, 2008) (citing *Barret v. Educ. Credit Mgmt. Corp (In re Barrett)*, 487 F.3d 353, 359-60 (6th Cir. 2007); *Educ. Credit Mgmt. Corp. v. Mosley (In re Mosley)*, 494 F.3d 1320, 1325 (11th Cir. 2007)).

Before reaching this conclusion, the Court considered all resources available to assist Marcotte in meeting his expenses. Specifically, whether Marcotte would be able to alleviate his "additional circumstances" if he liquidated assets, chiefly his 401K account. *See Nys*, 446 F.3d at 947 (stating that the court may consider "lack of assets, whether or not exempt, which could be used to pay the loan; . . . [and] [p]otentially increasing expenses that outweigh any potential appreciation in the value of debtor's assets and/or likely increases in the debtor's income" when determining "additional circumstances" under the second prong (citations omitted)).

Clearly, a liquidation of assets would not alleviate Marcotte's disability; however, additional available funds to repay the Loan or defray expenses could alleviate a portion of his unfortunate financial circumstances. TGSLC would certainly benefit if Marcotte withdrew funds from the account and paid the Loan in full or used the funds to continue payments on the Loan. However, Marcotte's evidence demonstrates that his dire circumstances—a disability that prevents him from working, results in higher medical expenses and leaves him without sufficient means to meet his basic needs—will continue for a significant period of time and would not be alleviated by this action. Although TGSLC would be repaid, Marcotte's circumstances would be far worse. Any value in requiring Marcotte to use the 401K to maintain payments on or pay off the Loan is outweighed by his evidence of additional circumstances. That is, he has shown that his hardship is unwarranted, excessive and exists through no fault of his own, and there is no evidence that his situation will improve in the future. Removing the 401K funds from his resources or requiring him to repay the Loan from any source available to him would cause further deterioration of his dismal financial situation.

<u>Third Prong of *Brunner*</u>

The third prong of *Brunner* requires a debtor to prove he has made good faith efforts to repay the student loans. *Brunner*, 831 F.2d at 396. In the Fourth Circuit, the good faith inquiry requires an examination of the debtor's "efforts to obtain employment, maximize income, and minimize expenses." *Frushour,* 433 F.3d at 402 (citations omitted); *see also Spence,* 541 F.3d at 544; *Mosko,* 515 F.3d at 324. Fundamental to the good faith inquiry is the notion that the "debtor may not 'willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control.'" *Mosko*, 515 F.3d at 324 (quoting *O'Hearn v. Educ. Credit. Mgmt. Corp.,* 339 F.3d 559, 564 (7th Cir. 2003)). The Court must also consider the debtor's effort to pursue loan consolidation options because it "illustrates that the debtor takes [his] loan obligations seriously and is doing [his] utmost to repay them despite [his] unfortunate circumstances." *Frushour,* 433 F.3d at 402*; see also Spence,* 541 F.3d at 544; *Mosko,* 515 F.3d at 324.

"[A] determination of good faith under part three necessarily includes a retrospective analysis because it focuses on the debtors' prior actions. We analyze the payments that debtors have *made* on their loans. Similarly, we do not judge a debtors' [sic] mere proposals, but their actual 'efforts' to minimize expenses." *Mosko*, 515 F.3d at 326 n.7 (emphasis in original) (citing *O'Hearn*, 339 F.3d at 564).

Marcotte previously consolidated his student loans and there is no assertion that he failed to take advantage of any consolidation or other plan of assistance available to him. He made payments on his Loan while he was employed and continued to make payments during a period of disability and until he filed for chapter 7 relief.[19] Marcotte maximized his

---

[19] *Cf. Spence v. Educ. Credit Mgmt. Corp. (In re Spence)*, 541 F.3d 538, 545 (4th Cir. 2008) (finding that the debtor did not make good faith efforts to repay her loan because she only made efforts to obtain deferments

income for as long as possible through his work.  Eventually the pain from his injuries became unbearable and he was unable to work any longer.  Since that time he has minimized his expenses, including moving in with his parents to make ends meet.  These facts significantly evidence Marcotte's good faith.

However, it is noteworthy that after the Bankruptcy Case was filed but prior to trial, Marcotte purchased a 1998 Jeep Wrangler to meet his transportation needs.  He was able to accumulate $3,800.00 to contribute to this purchase.  Courts have held that debtors do not meet the third part of *Brunner* if they incur expenses that are not necessary to maintain a minimum standard of living, thus, indicating a lack of good faith efforts to minimize expenses. *See Mosko*, 515 F.3d at 325 (stating that internet, cell phones, satellite television, and a YMCA membership are "[e]xpenditures . . . generally unnecessary to maintain a minimum standard of living and, under the facts of this case, the failure to minimize or eliminate these expenditures does not demonstrate a good-faith effort to minimize expenses" (citations omitted)); *see also O'Neal v. Educ. Res. Inst. (In re O'Neal)*, 390 B.R. 821, 824 (Bankr. D.S.C. 2008) (referring to debtor's expenditures on a cell phone and internet access); *Eddy v. Educ. Credit Mgmt. Corp. (In re Eddy)*, Adv. No. 1:05-ap-00210, 2006 WL 2818793, at *4 (Bankr. N.D. W.Va. Sept. 28, 2006) (finding that debtor did not sufficiently minimize her expenses because she continued to pay for health club dues, dance classes, cable, and $132.02 in recreational expenses).

---

and forbearances, which alone are insufficient to demonstrate a good faith effort.  In addition, once the deferments and forbearances expired, the debtor immediately filed for bankruptcy and did not make one payment on any of her student loans); *see also Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 326 (4th Cir. 2008) (stating that the debtors did not make good faith efforts to repay their student loans because they failed to make payments when their income substantially exceeded their necessary expenses); *Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner)*, 46 B.R. 752, 758 (S.D.N.Y. 1985) (finding that debtor did not satisfy the third prong because she filed for discharge of the student loan within a month of the date the first payment came due).

Marcotte testified that he needs the car for transportation to his various doctors' appointments, to the pain clinic, and to the pharmacy to refill his prescriptions.  While it is remarkable that he was able to save $3,800.00, frugally saving funds to make a necessary purchase should likely be commended instead of questioned.  A reasonable expenditure to meet Marcotte's long-term transportation needs is certainly a greater necessity than memberships to health clubs, internet access, satellite television and other recreational activities, and is not evidence of a lack of good faith on the facts of his case.[20]

Finally, the 401K balance must also be addressed under the third prong.  TGSLC argues that Marcotte has not made good faith efforts because he could have used the balance in his 401K account to repay all or a portion of the Loan or cover his expenses.  Marcotte is not required to prove that he has searched for every penny in the couch and handed it over to TGSLC before he can establish his good faith.  He is only required to prove by a preponderance of the evidence that he has made good faith efforts to repay his Loan.  "[P]roof by a preponderance of the evidence means that the 'trier of fact must believe that it is *more likely than not* that the evidence establishes the proposition in question.'"  *In re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010) (emphasis added) (quoting *Davis v. Combes*, 294 F.3d 931, 936-37 (7th Cir. 2002)).  Marcotte's evidence does not have to be perfect; rather,

---

[20] *See Wallace v. Educ. Credit Mgmt. Corp. (In re Wallace)*, C/A No. 06-2735, 2010 WL 5764771 slip op. at *4 (Bankr. S.D. Ohio Dec. 1, 2010) (stating that several courts have defined "minimal standard of living" to include "vehicles to go to work, to go to stores, and to go to doctors . . . [and] insurance for . . . those vehicles." (citing *Ivory v. United States (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001))); *see also Peña v. United Student Aid Funds, Inc. (In re Peña)*, 155 F.3d 1108, 1114 (9th Cir. 1998) (holding that debtors were entitled to discharge of their student loans despite the fact that they received a post-petition lump sum payment for past-due disability and used it to purchase an approximately twenty (20) year old car and to pay other bills. The Ninth Circuit reasoned that this did not preclude the debtors from satisfying the third *Brunner* prong because of the car's age (implying that debtors did not incur a large expense) and the creditor's failure to show why good faith would require the debtors to pay off the student loan instead of their other debts).

it must only convince the Court that it is "more likely than not" that Marcotte has made good faith efforts to repay the Loan.

Considering the facts, the following weigh heavily in Marcotte's favor: (1) his efforts to obtain and maintain employment despite his physical difficulties; (2) his efforts to maximize his income for as long as possible; (3) the length of time he continued to make payments on the Loan; (4) his efforts to minimize his daily living expenses by moving in with his parents; (5) the fact that his situation results from his physical challenges and through no fault of his own; and (6) his consolidation of the Loan.  This is significant proof of his good faith. *Cf. Sperrazza v. Univ. of Maryland*, C/A No. 07-CV-792, 2008 WL 818616, at *4 (E.D. Pa. Mar. 24, 2008) (finding that debtor did not meet the third *Brunner* prong because he "has not made a single voluntary payment on his debt obligation . . . and has not sought to restructure his loans . . . while during the same period of indebtedness he has made multiple debt payments to his parents . . . and contributed over $2,000 to a retirement savings plan").  These facts provide substantial evidence that Marcotte "takes [his] loan obligations seriously and is doing [his] utmost to repay them despite [his] unfortunate circumstances." *Frushour,* 433 F.3d at 402; *see also Spence,* 541 F.3d at 544; *Mosko,* 515 F.3d at 324.

The following considerations appear to the Court to be neutral, or at best detract slightly from Marcotte's showing of good faith: (1) purchasing a vehicle to meet his transportation needs rather than applying those funds toward repayment of the Loan; and (2) failing to liquidate his 401K account to repay the Loan.  The record does not contain any evidence that would lead the Court to believe that Marcotte has demonstrated a lack of good faith in making these two decisions.  Instead, they indicate only that he has made decisions

that do not directly benefit TGSLC.  TGSLC has not provided any authorities to persuade the Court that a debtor must make every decision with only the creditor's interest in mind before he can meet his burden of proof.  In fact, bankruptcy law requires the opposite—"the Bankruptcy Code does not require that the debtor live in abject poverty before a student loan may be discharged." *White*, 2008 WL 5272508, at *5 (citations omitted); *see also Cosner v. U.S. Dep't of Educ. (In re Cosner)*, 313 B.R. 690, 692 (Bankr. N.D. W.Va. 2004) ("[B]ankruptcy judges are to 'exercise discretion in determining whether a payment of a debt will cause undue hardship on the debtor and his dependents, thus defeating the 'fresh start' concept of the bankruptcy laws.'" (quoting 4 *Collier on Bankruptcy* ¶ 523.14[2] (15th ed. rev. 2002))).

After weighing the evidence and considering the credibility and demeanor of the witness on the good faith issue, the Court finds that Marcotte has satisfied the third prong of *Brunner* by providing significant and sufficient evidence of his good faith efforts to repay the Loan.

<u>**Conclusion**</u>

"Congress, in enacting § 523(a)(8), set a high bar for a debtor seeking to discharge government-guaranteed educational loans," *Frushour*, 433 F.3d at 403.  Marcotte has met this heightened standard by satisfying each prong of the *Brunner* test to demonstrate that he will suffer an "undue hardship" if required to repay the Loan.

Under the first prong, Marcotte has shown that, without considering the Loan payments, his monthly income is insufficient to meet his basic needs.  Therefore, if required to make monthly payments on the Loan, his budget would result in a larger deficit and he would be unable to maintain a minimal standard of living.

21

With regard to the second prong, Marcotte has proven that additional circumstances exist indicating that his state of affairs is likely to persist for a significant portion of the loan's repayment period. His injuries have rendered him unable to work and there is no indication that his condition will improve. He collects SSDI as his only income and his medical expenses will persist. *Cf. Spence*, 541 F.3d at 544 (holding that debtor failed to meet the second prong because, despite the fact that debtor suffers from diabetes and high blood sugar, those ailments did not affect her ability to work full-time); *Frushour*, 433 F.3d at 401 (finding that the debtor did not satisfy the second prong because she and her dependent did not suffer from any disabilities and she was earning a lower income than possible because she held higher paying jobs in the past); *Richardson*, 2008 WL 3911075, at *3 (holding that debtor's situation did not have a "certainty of hopelessness" because his only disability was from a back injury which he attributed a 20% disability rating, and a significant problem for the debtor was his negative attitude toward obtaining employment); *Straub* 435 B.R. at 317 (concluding that debtor did not satisfy the second prong because she "admitted that she was not permanently disabled and was capable of being gainfully employed").

To meet his burden of proof under the third prong, Marcotte has shown good faith efforts to repay his Loan by making payments for a significant period of time, continuing his payments until filing for chapter 7 relief and consolidating his Loan. *Cf. Spence*, 541 F.3d at 545 (stating that debtor did not make good faith efforts because she did not fully explore consolidating her student loans and filed for bankruptcy before making one payment); *Mosko*, 515 F.3d at 325 (finding that debtors' payments on their student loans were insufficient to satisfy the third prong because they did not make payments when their income substantially exceeded their necessary expenses); *Frushour*, 433 F.3d at 402

(holding that debtor did not satisfy the third prong because she did not seek out loan consolidation options, even though she made several payments on her student loan debt).  In addition, Marcotte has minimized his expenses by living with his parents and maximized his income by working until the pain from his injuries prevented him from working any longer. *Cf. Spence*, 541 F.3d at 545 (finding that the debtor did not maximize her income because "[s]he is highly educated yet appears to be satisfied working as a mail services specialist . . . [and] [s]he has not made efforts to continue pursuing a more lucrative line of work . . ."); *Mosko*, 515 F.3d at 325 (concluding that co-debtors did not demonstrate good faith efforts to maximize income because one willfully did not work during the summer months and the other refused a job offer and did not have any medical conditions precluding him from working).  Therefore, Marcotte has met his burden of proof.[21]

Based on the evidence presented and the foregoing, **IT IS ORDERED,**

That the Loan owed to TGSLC is hereby discharged.

---

[21] *In re Brown*, Adv. No. 06-24, 2007 WL 1747135 (Bankr. N.D. W.Va. June 15, 2007), is one of the few decisions in this Circuit granting discharge of a student loan after the *Frushour* decision.  Unlike Marcotte, the debtor in *Brown* did not suffer from a disability, was able to continue working throughout the student loan's repayment period, and lived with her husband and two adult sons whose contributions to the household expenses were negligible or non-existent. *Id.* at *1.  Despite these circumstances, the bankruptcy court held that debtor was entitled to discharge her student loans because she and her dependents would suffer an undue hardship if forced to repay them. *Id.* at *6.  The *Brown* court found that the debtor could not maintain a minimal standard of living because her modest expenses outweighed her income and she was the primary source of support for her household. *Id.* at *2.  The debtor satisfied the second prong because her budget ran a deficit and she would incur necessary expenses in the future to replace her old vehicle. *Id.* at *3.  In addition, she earned a low income but had not chosen to be underemployed because she actively sought higher paying employment. *Id.* at *4.  Lastly, the court determined that the debtor made good faith efforts because she had few fixed expenditures, no frivolous expenses and repeatedly sought employment to maximize her income. *Id.* at *5.  The court found that her failure to seek loan repayment options was not dispositive in determining good faith and that her negative budget prevented her from making any payments on the loans. *Id.*  It appears that the *Brown* court granted a discharge in circumstances equal to or less severe than those surrounding Marcotte.